AMERICAN FELSOL CO. ET AL. *v.* UNITED STATES (No. 4134)[1]

United States Court of Customs and Patent Appeals, February 28, 1938

*Edwin D. Howald* for appellants.

*Charles D. Lawrence,* Acting Assistant Attorney General (*Daniel G. McGrath,* special attorney, of counsel), for the United States.

*Lamb & Lerch* (*John G. Lerch* of counsel), *amici curiae.*

[Oral argument February 8, 1938, by Mr. Howald, Mr. McGrath, and Mr. Lerch]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges [2]

BLAND, Judge, delivered the opinion of the court:

The imported merchandise involved in this appeal is a mixture consisting of 93 per centum antipyrine, 6 per centum caffeine citrate, and 1 per centum moisture, described by the appraiser in his answers to the protests and invoiced as "phenyldimethylisopyrazolon-caffeino-citricum."

---

[1] T. D. 49454.

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

The Collector of Customs at the port of Cleveland, Ohio, classified the merchandise as dutiable under paragraph 28 (a), Tariff Act of 1930, as a medicinal coal-tar derivative, and assessed the same with a duty of 45 per centum ad valorem and 7 cents per pound.

The importers protested the classification and claimed the merchandise to be dutiable under paragraph 5 of said act under the term "all medicinal preparations, and all combinations and mixtures of any of the foregoing," which claim is the only one relied upon here.

The United States Customs Court, First Division, overruled appellants' protests, and from the court's judgment appellants have here appealed.

The pertinent statutory provisions follow:

PAR. 28. Coal-tar products:

(a) All colors, dyes, or stains, whether soluble or not in water, except those provided for in subparagraph (b), color acids, color bases, color lakes, leucocompounds, whether colorless or not, indoxyl, and indoxyl compounds; ink powders; photographic chemicals; acetanilide suitable for medicinal use, acetphenetidine, acetylsalicylic acid, *antipyrine*, benzaldehyde suitable for medicinal use, benzoic acid suitable for medicinal use, beta-naphthol suitable for medicinal use, guaiacol and its derivatives, phenolphthalein, resorcinol suitable for medicinal use, salicylic acid and its salts suitable for medicinal use, salol, and other medicinals; sodium benzoate; saccharin; *artificial musk, benzyl acetate, benzyl benzoate, coumarin, diphenyloxide, methyl anthranilate, methyl salicylate, phenylacetaldehyde, phenylethyl alcohol, and other synthetic odoriferous or aromatic chemicals, including flavors, all these products not marketable as perfumery, cosmetics, or toilet preparations, and not mixed and not compounded, and not containing alcohol;* synthetic phenolic resin and all resinlike products prepared from phenol, cresol, phthalic anhydride, coumarone, indene, or from any other article or material provided for in paragraph 27 or 1651, all these products whether in a solid, semisolid, or liquid condition; synthetic tanning materials; picric acid, trinitrotuluene, and other explosives except smokeless powders; *all the foregoing products provided for in this paragraph, when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1651;* natural alizarin and natural indigo, and colors, dyes, stains, color acids, color bases, color lakes, leuco-compounds, indoxyl, and indoxyl compounds, obtained, derived, or manufactured in whole or in part from natural alizarin or natural indigo; natural methyl salicylate or oil of wintergreen or oil of sweet birch; natural coumarin; natural guaiacol and its derivatives; vanillin, from whatever source obtained, derived, or manufactured; *and all mixtures, including solutions, consisting in whole or in part of any of the articles or materials provided for in this paragraph, excepting mixtures of synthetic odoriferous or aromatic chemicals,* 45 per centum ad valorem and 7 cents per pound. [Italics ours.]

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

Appellants here claim that the merchandise is excluded from paragraph 28 (a) by reason of two excluding clauses in said paragraph, the first of which clauses reads:

* * * all these products not marketable as perfumery, cosmetics, or toilet preparations, *and not mixed and not compounded,* * * * [italics ours]

and the second clause being the concluding one of the paragraph as follows:

\* \* \* and all mixtures, including solutions consisting in whole or in part of any of the articles or materials provided for in this paragraph, *excepting mixtures of synthetic odoriferous or aromatic chemicals* \* \* \*. [Italics ours.]

It will be noticed that the first excluding clause is confined to synthetic odoriferous or aromatic chemicals, and provides that they are excluded if mixed or compounded. The said second clause also excludes mixtures of synthetic odoriferous or aromatic chemicals. Since our conclusion as to the meaning of the second excluding clause is controlling of our conclusion as to the first one, we will discuss it first.

Appellant produced three qualified chemists as witnesses who testified in substance that antipyrine was an aromatic chemical. Their testimony was to the effect that the imported article is a mixture of several components including antipyrine, a synthetic chemical derived from phenylhydrazine which is a coal-tar derivative; that the "text books of organic chemistry are divided into two portions, aliphatic and aromatic," and that "the term 'aromatic' in organic chemistry means to cover those compounds in which either the benzine ring or the equivalent is present"; that antipyrine, having the benzine ring characteristic is an aromatic and that the benzine nucleus, or benzine ring, is composed of a close chain of six carbon atoms with one hydrogen atom attached to each of the carbon atoms.

The Government introduced the testimony of several witnesses, some of whom were chemists, and well qualified to testify on the subject, who gave it as their view that antipyrine was not a synthetic odoriferous or aromatic chemical; that it had no odor, was never used in perfumery or flavoring and that they had never heard of it being used as a fixative; that pricelists and catalogs of aromatic chemicals did not contain antipyrine. One witness stated that he had never seen antipyrine sold or advertised as an aromatic chemical. Some of the Government's witnesses recognized that in scientific chemistry, articles which contained the benzine nucleus or benzine ring were broadly regarded as aromatics. One of the witnesses stated that the benzine ring in the instant merchandise was not the feature which made for its classification.

One of the Government chemists, employed by the Dow Chemical Co., domestic manufacturer of antipyrine, stated that an aromatic chemical is one that has a pleasing odor and taste and that the antipyrine at bar, being a medicinal and not having a pleasing odor and taste, was, in his opinion, not to be regarded as an aromatic chemical: that he never sold antipyrine as an aromatic chemical and that he never knew anyone to offer to buy it as such; that it is sold for medicinal use in making preparations to cure fevers and headaches.

Edgar C. Britten, a chemist of vast experience, also employed by the Dow Chemical Co., testified for the Government and in substance said that there were two definitions for the term "aromatic chemical," one referring to the aroma characteristic, which is the usual definition, and the other, a chemical compound which belongs to the benzine series of organic compounds; that antipyrine contains the benzine ring; that there were two aromatic chemicals that did not have the benzine ring and that the fact that the imported merchandise has the benzine ring does not necessarily make it an aromatic chemical.

It is not deemed important to discuss further the testimony of the witnesses. It may all be summed up to the effect that in scientific textbooks, aromatics are broadly defined as those chemical compounds which have the benzine nucleus or benzine ring while the common non-scientific definition is "a mixture or compound having a pleasing smell or taste." The testimony, which shows that there are two meanings for the word "aromatic," one the scientific meaning, and the other the common meaning, is supported by the lexicographical authorities. In Webster's New International Dictionary, the following definitions are found:

aromatic ⎫ *a.* 1. Of, pert. to, or containing aroma; fragrant; spicy; strong-
aromatical⎭ scented; odoriferous; as, *aromatic* balsam.

2. *Chem.* Derived from, or characterized by the presence of, the benzene nucleus:—said of a large class of cyclic organic compounds. This use of *aromatic* arose from its ordinary use as descriptive of the odorous compounds, as oil of wintergreen, of bitter almond, etc., of this class.

aromatic, *n.* A plant, drug, or medicine characterized by a fragrant smell, and usually by a warm, pungent taste, as ginger, cinnamon, spices.

The question presents itself, which of the definitions should we adopt in deciding the issue at bar?

In deciding this question, we are helped considerably by the context of the paragraph as a whole. It will be noticed that among the coal-tar products is first mentioned a number of colors and dyes; also various chemicals, including antipyrine, "suitable for medicinal use," and later therein is a provision for "artificial musk * * * and other synthetic odoriferous or aromatic chemicals, including flavors, all these products not marketable as perfumery, cosmetics, or toilet preparations and not mixed and not compounded." Certain articles with odor or flavor, used in making perfumes, cosmetics, or toilet preparations are included, if not mixed and not marketable as perfumery, cosmetics, or toilet preparations. Now, Congress has used the term "synthetic odoriferous or aromatic chemicals" in that portion of the paragraph as applied to articles wholly different from the medicinal preparations listed along with antipyrine. If the

instant medicinal was an aromatic in the common sense in which we think Congress used the term, we would naturally look for it elsewhere than with its medicinal associates in the early part of the paragraph.

In support of our conclusion that Congress, in using the term "odoriferous or aromatic chemicals" used it in its common, ordinary sense and not in the technical, scientific sense, the following authorities would seem to be in point:

In *Bakelite Corporation et al.* v. *United States*, 16 Ct. Cust. Appls. 378, T. D. 43117, the court had under consideration paragraphs 27 and 1549, Tariff Act of 1922, both being "coal-tar products" paragraphs. Construing certain language of the paragraphs, the court said:

> The word [products], as used in the statute, must be given its ordinary meaning, no commercial designation being attempted to be shown. If the testimony of the witnesses for the importers may be construed as simply expressing their interpretation of the statute, then such testimony is immaterial; if their statements may be taken as an attempted statement of the scientific meaning of the word "products," it is sufficient to note that tariff acts are drafted, "not in the terms of science, but in the language of commerce, which is presumptively that in common use." *Meyer & Lange* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436.
>
> It follows, therefore, that the words "coal-tar products," which introduce the language of said paragraph 27, refer to materials or things produced from coal tar, such as are enumerated thereinafter. And this, we believe, is the meaning to be attached to it, wherever found in the paragraph. It is not reasonable to assume that the Congress had in mind any fine technical distinctions, such as men of science might draw, between chemical individuals and compounds and products. * * *

In the opinion of the Supreme Court of the United States, delivered by Mr. Justice Story, in *Two Hundred Chests of Tea; Smith, Claimant*, 9 Wheat. 428, 437, the court used the following language which we think aptly applies to the issue at bar:

> The argument on behalf of the United States, is, that the two hundred chests of tea, now in controversy, are in reality simple congo tea, and not bohea; that the latter is a pure unmixed tea, entirely distinct from congo, and known in China by an appropriate name; that it is to this pure and unmixed bohea tea, that the successive acts of congress refer, and not to any other mixed tea, though known by the common denomination of bohea. If we were to advert to scientific classifications, for our guide on the present occasion, it is most manifest, from the works cited at the bar, that bohea is a generic term, including under it all the black teas, and not merely a term indicating a specific kind. But it appears to us unnecessary to enter upon this inquiry, because, in our opinion, congress must be understood to use the word in its known commercial sense. The object of the duty laws is to raise revenue, and for this purpose, to class substances according to the general usage and known denominations of trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists

or botanists. It applied its attention to the description of articles, as they derived their appellations in our own markets, in our domestic as well as our foreign traffic. And it would have been as dangerous as useless, to attempt any other classification, than that derived from the actual business of human life. Bohea tea, then, in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation. And even if the article has undergone some variations in quality or mixture, during the intermediate period from 1789 to 1816, when the last act passed, but still retains its old name, it must be presumed that congress, in this last act, referred itself to the existing standard, and not to any scientific or antiquated standard.

For the reasons aforesaid, we are of the opinion that the imported merchandise is a mixture which includes antipyrine, a medicinal coal-tar product, and that antipyrine is not a synthetic odoriferous or aromatic chemical, and, is, therefore, not excluded from the paragraph but specifically included therein. The provisions of paragraph 28 are more specific as applied to the merchandise at bar than are the provisions of said paragraph 5. No contention is made here to the contrary.

Appellants have made several assignments of error which we need only briefly discuss. Error is assigned challenging the correctness of the court's action in admitting over appellants' objections testimony as to the meaning of the term "aromatic chemical." Under the circumstances at bar this action was not erroneous. The court properly admitted testimony offered by the appellants and by the Government concerning the meaning of the controverted terms.

Error has been assigned against the action of the trial court in placing "this case on the docket for further testimony after the submission of the case" over the objection of appellants. The United States Customs Court is a trial court and has a very wide discretion with reference to such matters as granting new trials, receiving additional evidence and granting continuances. We do not think that the trial court went beyond its discretionary power in placing the case on the docket and in receiving additional evidence in the manner complained of.

Appellants' ninth assignment of error is directed to the court's holding in effect that the Government was not bound by admissions made in the affidavit attached to the motion to restore the case to the docket for further testimony. It is not seen how any statement made by the Government with reference to the character of the merchandise in a petition to hear more evidence could possibly bind the trial court in arriving at a judgment as to the proper classification of the merchandise.

We hold that all of appellants' assignments of error are without merit, and the judgment of the United States Customs Court is *affirmed*.